# OVERVIEW OF RAY AND SONJA FOSTERS' FRAUD SCHEMES

## Introduction

**Rayshwan Foster** ("**Ray**") and **Sonja Foster** ("**Sonja**") (collectively, "the **Fosters**") are a husband-and-wife white collar crime team, who have been stealing homes and money through real estate title and mortgage fraud across multiple states since 2005. The Fosters are (or were) based in Southern California's Inland Empire. Ray is the con-man field agent and public face of the duo, who interfaces with and deceives the various victims. Sonja quietly runs the back office operations, leveraging her credibility as a California Department of Real Estate ("**DRE**") licensed real estate broker. The Fosters' crimes have been aided by apparently corrupt DRE-licensed real estate professionals (including title and escrow officers), attorneys (one of whom Gov. Gavin Newsom recently appointed to be a California Superior Court judge), and even a prominent DOJ-appointed U.S. Trustee.

Eight months of preliminary research into public records, across multiple jurisdictions, has *so far* found 82 homeowners in California who are either confirmed or likely victims. Many of these victims are elderly. Gaps in the data timeline indicate this barely scratches the surface of the true California victim count, and the Fosters are known to have victims in additional states, including (at minimum) Washington, Oregon, Nevada and Arizona.

Ray, Sonja and/or their alter ego legal entities have been sued a few times in association with their frauds[1]. Yet the Fosters have mostly gotten away with their crimes scot-free (and certainly evaded the criminal arrest and prosecution their serious offenses warrant), due to a combination of several factors. (1) Their careful selection of naïve and powerless victims; (2) The difficulty in detecting or understanding the complex, multi-part fraud crimes the Fosters commit; (3) The failure of many victims to even *try* to file a crime report, because the victim often doesn't understand - and thus *can't* report - what the Fosters actually did to them; (4) A misperception by many in law enforcement that what the [rare] confused homeowner victim in front of them is complaining about sounds like a civil matter, resulting in refusals to even take crime reports, *or* reports that are inaccurate, due (again) to the victim's inability to fully understand the actual crimes; (5) A lack of a centralized coordinated response to individual crime reports across multiple jurisdictions; (6) A lack of care from the *pro bono* legal community and the courts; and perhaps most of all, (7) A lack of widespread media attention to warn the public about the danger the Fosters pose, and demand the Fosters' arrest, prosecution, and justice for their victims.

## Ray and Sonja's Backgrounds

Sonja appears to be a naturalized U.S. citizen from Germany. DRE records list Sonja Kirk as her former name; it is unclear if this is her maiden name, or an alias. Sonja has also gone by Sonia Perez, and may have held multiple DRE licenses under other aliases.

Ray was born on ▉▉▉▉▉▉▉ ; his SSN is ▉▉▉▉▉▉▉▉ . Ray's mother (either biological or adopted) was Barbara Boyd; she appears to have also held multiple California DRE licenses under different aliases, which she also used in real estate records. Ray grew up in LA, and attended McKinley Elementary at 7812 McKinley Ave, Los Angeles, CA 90001.

---

[1] These suits have included, but are known to not be limited to, *Lee vs. Bedney* (6/3/2008) Cal. Superior Ct. Riverside INC077775; and *Thompson vs Ticey* (4/7/2009) Cal. Superior Ct. Riverside RIC498899.

On 7/23/1997, 20-year-old Ray was arrested on Federal cocaine trafficking charges in the District of Kansas (*USA v. Foster* (1997) D. Kans. 6-97-cr-10099). His mom bailed him out. Ray pled guilty, and was sentenced to one year in prison (BOP number 08500-031). Ray then returned to the San Bernardino area on three years probation, but was arrested on probation violations in 2001, and again in 2003. Records viewable in any Central District of California courthouse (but not on PACER) show Ray's second 2003 violation earned him six more months behind bars (*USA v. Foster* (2001) C.D. Cal 2:01-cr-00546).

Upon finally being released from prison on 12/16/2003, **Ray summarily changed the spelling of his first name to "Rayshon,"** in an apparent attempt to conceal his criminal past. So far, no record has been found of Ray ever applying to any court for a legal name change. Under his new assumed name, Ray immediately embarked on a brief, one-year career defrauding homeowners while pretending to be a licensed home improvement contractor. When caught and sued by his victims, Ray declared bankruptcy in an apparent attempt to escape civil liability for his crimes … a trick he would repeat 17 years later (see *Rayshon Andrew Foster* (2005) Bankr. C.D. Cal. 6-05-bk-11002; and *Flashberg v. Foster* (2005) Bankr. C.D. Cal. 6-05-ap-01067, *see* Doc 11-1 at pgs. 5 - 10).

In 2005, Ray then settled into what has been a nineteen-year career as a top-tier con man, who in partnership with Sonja, steals both homes and money through real estate title and mortgage fraud, while hiding behind successive California entity alter-ego[2] legal fig leafs, a smorgasbord of different rented and/or inaccurate mailing addresses, and phone numbers and email addresses the Fosters routinely disconnect to evade their victims.

**FRAUD SCHEME #1**
**Stealing homes**
**(Grand Theft by Deception of Real Estate via Title Fraud)**

**Ray's** *modus operandi* is to appear (often uninvited) at the front door of people facing foreclosure, bearing an incredibly generous offer to "save" their home ownership: he will call their bank, pay off all their back due mortgage, and let the homeowner keep their house! All the homeowner has to do is just agree to pay Ray back $X amount per month for five years, until Ray is repaid in full. *In the mean time*, the victim just needs to sign a grant deed, giving their home over to an LLC which functions as a pass-through, legal fig leaf alter ego for Ray and Sonja. Ray repeatedly emphasizes he is "saving" the victim's home and home ownership, and assures each victim that the grant deed is just a form of security collateral (because "I gotta protect my money"), and they will be able to get their home back after they finish repaying him in five years. Ray is essentially offering to **loan** the victim money in exchange for a security interest in their home until he is repaid, so the victim must be ignorant of the fact the proper legal instrument for such a transaction is a Deed of Trust (a.k.a. *a mortgage*), and not a Grant Deed (*"I grant my house to you"*).

If a homeowner is reluctant to let Ray pay off their back due mortgage, and/or sign a grant deed, Ray usually makes an alternative (or additional) financing proposal that still

---

[2] Alter egos of the Fosters identified so far include Prime Family Investors, Inc. (registered on 11/1/2005), Majestic Valley Investments, LLC (1/3/2007, controlled by Prime Family Investors), 5620 Walter Street, LLC (8/8/2007, controlled by Majestic Valley Investments), Advance Solutions Co. (10/14/2008), 2nd Chance Investment Group, LLC (7/29/2016), Foster & Foster Realty, LLC (6/12/2018), Foster & Foster Realty, Inc. (10/23/2018), Advance Real Estate & Construction Solutions Corp (12/19/2019), and more.

leads to the naïve victim having to sign a grant deed as a form of security collateral, often with the same five-year repayment period attached. This proposal is usually an offer to either (1) finance and/or perform repairs on the victim's home, (2) give the victim a loan to pay off other non-mortgage bills, or (3) refinance the victim's existing mortgage to lower their monthly payments. Once again, the proper legal instrument for all of these proposed financial **loan** transactions is a deed of trust (mortgage), and *not* a grant deed.

Throughout his interactions, Ray assesses each homeowner for personal vulnerabilities, probing for anything that he can exploit to gain their confidence. Ray seems to prefer ultimately selecting victims whom he deems both low-information, highly vulnerable, and unlikely (or better yet *unable*) to put up any civil legal fight or call law enforcement, after they are ultimately forced out of their home, and realize that Ray stole their house.

Ray routinely has each victim sign a credit check authorization form, entitled "Borrower Authorization Form," through which the Fosters obtain the victim's social security number. When dealing with homes in foreclosure, Ray has sometimes complied with the requirements of the California Home Equity Sales Contract Act to have the homeowner sign a written Home Equity Sales Contract (*see* Cal Civil Code § [1695 – 1695.17](#)). These contracts have contained written reflections of Ray's oral promise that the homeowner will be able to get their home back in five years, thus rendering any grant deed void as a function of law under Civ. Code § [1695.12](#). However, Ray is not known to have ever complied with the provision of the Act that requires him to *timely* leave the homeowner a copy of both the contract, and the required right to cancellation notice (Civ. Code § [1695.5(c)](#)). Most victims are often left with *no* written documentation of Ray's promises.

**The important, bottom line fact common to all of Ray's victims** is that none of them ever intend or agree to permanently give ownership of their homes to either Ray or any of the Fosters' LLCs. Instead, the victims believe Ray's claim that the grant deed is only a form of security collateral "because I gotta protect my money," and think they will be able to get full ownership of their home back in five years. As a result of this lack of *intent* to permanently convey title, none of these grant deeds are ever d*elivered* to the Fosters' LLC (as delivery is defined in real estate case law), and are thus all *void ab inito*.

**FRAUD SCHEME #2
Obtaining money from mortgage lenders under false pretenses
(Grand Theft by Deception, Mortgage Fraud, Wire or Mail Fraud, Perjury)**

If the homeowner agrees to sign a grant deed in exchange for a loan from Ray to "save" their home (and sometimes when a homeowner does *not* agree, and the Fosters just *forge* a grant deed instead), Sonja then prepares or secures purchase and escrow documents that falsely indicate the Fosters' LLC paid the victim near market value for their home. In truth, Ray conned the victim into signing a grant deed for free or nearly free. The Fosters appear to receive assistance in securing some of these falsified documents from certain corrupt escrow officers, title officers, and other licensed real estate professionals. If the victim asks about the falsified purchase price in any paperwork that Ray tells them to sign, Ray typically tells the victim that this false information is only to "protect" their neighbor's home values from being damaged by his generosity in "saving" their home.

The Fosters then submit this falsified purchase paperwork to a hard money lender who finances home flippers, and take out a huge, often short-term mortgage on the victim's home in the name of the Fosters' LLC. The Fosters claim their LLC is paying this money to the victim, or that the victim is borrowing the alleged purchase price from them. But some of these lenders have since admitted to multiple witnesses that they either knew and/or suspected at the time the Fosters were not actually paying the homeowners, and/or were committing fraud (yet they continued doing business with the Fosters anyway).

Often, the Fosters also submit this falsified paperwork to the victim's mortgage provider, as part of the process of either (1) convincing the provider to cancel any trustee's sale and/or accept their LLC's payoff of the remaining balance on the victim's mortgage, or (2) *taking over* the victim's existing mortgage account *without* paying off the balance, by switching the mailing address, phone number and email on the victim's account to addresses and numbers controlled by the Fosters.

California Revenue & Taxation Code § 480 - 487 requires that a Preliminary Change of Ownership Report ("**PCOR**"), sworn under penalty of perjury, be filed with every real property deed, reporting both the purchase price and Documentary Transfer Tax ("**DTT**") that were paid. So in California, the Fosters file a falsified PCOR with the local county Clerk, who then forwards it on to the county Assessor … neither of whom has any idea the accompanying grant deed is *void ab inito* for lack of delivery (and also usually as a function of law under Cal. Civil Code § 1695.12, because the home was in foreclosure when the grant deed was [allegedly] signed, and Ray promised the homeowner they would or could get their home back). If the PCOR reported a below-market-value purchase price, the Assessor would conduct a further investigation of the transaction, and the Fosters might get caught. But because the Fosters' falsified PCOR reports a purchase price that is at or near market value, the Assessor signs off on the transaction and DTT amount, and the change of ownership paperwork sails through the public records system.

The homeowner victim has no clue that the Fosters' LLC has taken out a new mortgage on their house. Instead, the Fosters use a portion of the funds from this new mortgage to pay off the victim's old mortgage, often after Sonja has contacted the victim's mortgage provider, and negotiated a reduced payoff. The naïve victim then gets a Notice of Full Reconveyance, thinks Ray is indeed their trustworthy savior and friend, and is happily willing to make the $X monthly payments, believing everything is as Ray promised, and they will get to keep their home after they finish paying Ray back in five years.

After initially using a portion of the funds from the hard money lender to pay off the victim's old mortgage, the Fosters seemingly use the remaining funds to do one of three things: (1) Finance their lifestyle; (2) Fund what is believed to be an offshore account held under the name of the BJB Family Trust[3] (BJB likely standing for the initials of Ray's mother, Barbara Jean Boyd); (3) Pay off the "investor" victims of their fourth *simultaneous* fraud scam: a real estate investment Ponzi scheme.

---

[3] According to a Homestead Declaration that Ray recorded in LA County on 10/11/2023 (Doc # 20230692574), the BJB Family Trust also owns Ray's home at 4349 South Victoria Avenue in Los Angeles, CA 90008. This is the same address that his mother Barbara listed in court paperwork as her residence when she bailed Ray out after his cocaine trafficking arrest in the 1997 District of Kansas case.

## FRAUD SCHEME #3
### Draining victims for monthly payments under false pretenses
### (Grand Theft by Deception, Wire Fraud, Tax Evasion)

Ray convinces the homeowner victim that the Fosters' LLC is now the [temporary] owner of their house, and their monthly payments are the "rent" they now owe. Only, **Ray does not have the victim send their payments to the Fosters' LLC**. Instead, Ray has the victim send their payments to Ray or Sonja *personally*, via such professional, above-the-board methods as having the victim go to their local Walmart, and send a Walmart to Walmart wire transfer to Rayshon Foster at the Ontario, California Walmart. The vendor that provides this service to Walmart, RIA Financial Services, eventually identified Ray as a criminal around May of 2022, and shut down his access to their services. Ray then had some victims switch over to sending their payments to Sonja's personal Venmo account, before apparently realizing that Walmart also offered Moneygram wire transfers.

The reader can make an educated guess as to whether any of these funds were ever recorded on the books of any of the Fosters' LLC's, or reported to any tax authorities.

The victims only agree to make these monthly payments because Ray has convinced the victim they will get to keep their home after they have paid Ray monthly for five years. Historically, the Fosters often strung their homeowner victims along for an extended period (sometimes years), collecting payments until apparently threatening the victim into abandoning their home, and/or reselling the victim's home (sometimes to another real estate agent and possible co-conspirator), and letting the new owner evict the victim.

Most recently, however, the Fosters eschewed long-term "rent" collection, in favor of taking the remaining funds from the hard money lender and running off, leaving the victim's home to be foreclosed upon over what the clueless, confused victim thought was their original mortgage (which the Notice of Full Reconveyance said had been paid off).

## FRAUD SCHEME #4
### Real Estate Investment Ponzi Scheme
### (Grand Theft by Deception, Wire Fraud)

In or around 2016, the Fosters launched a *fourth* fraud scheme on top of their first three schemes of title fraud, mortgage fraud, and draining homeowners of monthly payments based on the false pretense of Ray's promise that they would get to keep their homes.

Ray has never had any real estate license of any kind, and thus may not even lawfully buy homes in foreclosure in California, per Cal. Civil Code § [1695.17(a)(1)](). But what Ray *does* have [or had] is a big online presence, where he promises to teach *you* all of Ray Foster's Secrets to get rich quick in real estate "investing" *[SPOILER ALERT: the secret is fraud]*. Ray's promotional videos on [YouTube](), [Facebook]() and [Instagram]() portray[ed] a glamorous lifestyle of beachside mansions, luxury yachts and exotic cars, all available to anyone who is willing to accept his "one-on-one coaching". Although Ray deleted much of his online presence after a group of investors sued him for fraud in 2022, one still-active [Facebook post from 2/8/2020]() reads, "College wasn't an option for me. Survival in the streets was a must, so hustling came easy 💸. Let Ray Foster's Secrets to Real Estate Investing show how to hustle and give you that luxury lifestyle you deserve💯" [sic].

Ray used his online presence to attract wide-eyed real estate neophytes to come to his [paid?] in-person and online seminars, where he presented himself as a real estate guru, and preached that if you just followed in his footsteps, *YOU* could get rich in real estate too! Ray would eventually convince some of his seminar acolytes to become "investors" in his vast real estate "empire." The pitch was simple: you "invest" $20 – 80K with Ray, *which will be protected by this Deed of Trust to this house that Ray's LLC legally owns*, and in a few months time, Ray will give you your money back *plus 20%* guaranteed!

According to a lawsuit by a group of these investor victims, this was actually just a Ponzi scheme, in which the new investors paid off the old. The first few investments would work out as promised, building the victim's confidence, which Ray would then exploit to convince the victim to get their friends and family to invest. Eventually, Ray convinced these victims to invest their sweat equity promoting the Fosters' LLC, cold calling other potential investors, and even providing funds for what Ray *claimed* would be the purchase of bus and billboard ads for the Fosters' LLC[4].

Only, Ray couldn't get enough [*void ab inito*] grant deeds by knocking on the doors of Alzheimer's patients and blind ladies to keep this Ponzi scheme going. So the Fosters went on Photoshop, created fake deeds of trust to homes they had no transactional history with at all, and sold those fake deeds to their Ponzi scheme investors.

Eventually, a group of investors who had engaged in over 150 transactions with Ray, and were owed millions, started getting wise, and began confronting Ray in late 2021. Ray eventually claimed he had made a mistake, promised to make things right, and signed an agreement to make monthly payments. But the Fosters apparently knew the jig was up, and went on an accelerated crime spree as part of an exit strategy. In 2022, the Fosters began grabbing as many homes as Ray could connive (often outright forging grant deeds to do so), taking out hard money mortgages, and then not making any payments on those mortgages at all. Some of the surplus mortgage cash was used to make a few of the promised payments to the Ponzi scheme victims. The rest was stuffed elsewhere (perhaps offshore in the BJB Family Trust), likely in anticipation of the Fosters' exit strategy.

On September 26, 2022, Ray cut off all communication with the investors who had confronted him. On October 24, 2022, those investors then filed a $5 million fraud suit against Ray, Sonja, and two of their LLC's in Riverside Superior Court. (*ASB Ventures, LLC v. 2nd Chance Investment Group, LLC*, Cal. Superior Ct. Riverside CVRI2204640). A month later, on November 22, 2022, the Fosters sold their home at 12812 Clemson Drive in Eastvale, California 92880, then fled California to the State of Virginia (either in fear of arrest, and/or to restart their confidence fraud schemes anew in a fresh State). As part of their disappearing act, the Fosters also took down their LLC's website, closed their mailing addresses, shut down all the payment accounts their homeowner victims had been using to send their monthly "rent" (so the victims were unable to make any more payments), and disconnected all the phone numbers and emails their victims had, so the homeowner victims could not contact them to make any new payment arrangements.

---

[4] While Ray *claimed* these funds were for buying ads, in a later court filing, Ray described the apparent vendor for these ads, Lamar Advertising, as an "investor" in his LLC to whom he owed $1,286,803.17 … which sounds like Ray conned Lamar into giving him free ads upfront (in exchange for ?), then used those ads as a pretext to steal more money from his "investors."

### FRAUD SCHEME #5
### Bankruptcy Fraud (18 U.S.C. § 157), Perjury, and
### Knowingly Selling or Aiding in Selling Stolen Property (California PC § 496(a))

The Fosters then responded to the investor's $5 million fraud suit by committing their biggest fraud yet. On December 21, 2022, they caused 2nd Chance to file a Chapter 11 bankruptcy Petition in the Central District of California (*2nd Chance Investment Group*, Bankr. C.D. Cal 8:22-bk-12142). 2nd Chance's principal place of business was 4295 East Jurupa Street #209 in Ontario, California 91761, so this Petition *should* have been filed in the Central District's Eastern Division in Riverside. But for reasons TBD, the legal mastermind behind the case forum-shopped the Southern Division in Santa Ana, by renting a virtual mailbox in Santa Ana to list as 2nd Chance's address in the Petition. This address had never been registered to or used by 2nd Chance prior to this filing.

2nd Chance's Petition - signed by Ray under penalty of perjury - falsely claimed 2nd Chance had a fee simple ownership interest in fourteen homes. Separate filings falsely told the bankruptcy court that the people living in these homes were "tenants" of 2nd Chance, who had [strangely] all forfeited their leases through non-payment of rent. No mention was made of the fact these alleged "non-payments" were actually the result of the Fosters intentionally *preventing* these victims from being able to *make* any payments (and thus waiving any contractual right 2nd Chance had to receive said payments), by shutting down all of their payment accounts, phones, emails and websites, returning all checks sent by mail, and effectively disappearing after the bankruptcy case was filed (this was clearly done to manufacture a false claim of non-payment of rent as a legal pretext to then evict the homeowner victims). The bankruptcy court was certainly never told there was anything amiss with the chains of title to any of these fourteen [stolen] homes.

2nd Chance's attorneys of record in the bankruptcy case are Amanda G. Billyard (SBN 256838), Andy C. Warshaw (SBN 263880), and Rich L. Sturdevant (SBN 269088). But the legal mastermind who actually planned and orchestrated the case is suspected to be David M. Goodrich ("**Goodrich**", SBN 208675), a highly prominent Orange County bankruptcy attorney, and one of just 30 members of the elite Chapter 7 Trustee panel for the Central District of California, appointed by the Office of the United States Trustee (part of the United States Department of Justice). U.S. Trustees are charged with policing the bankruptcy system for the very sort of bankruptcy fraud that Goodrich is certainly involved with, and appears to be orchestrating, in the 2nd Chance case.

Goodrich was hired by 2nd Chance on December 2, 2022, nineteen days before the December 21 bankruptcy filing ... only, not as a lawyer for the Fosters or 2nd Chance. On paper, Goodrich was instead hired as **a private employee of 2nd Chance who reports directly to Ray** in the role of "Chief Restructuring Officer," and whose advice to Ray was to be given as a fiduciary, *not* as a lawyer (*supra*, Doc 42, pg. 4 at 17 – 20, pg. 12, pg 13 at ¶ 5). Regardless of whether Goodrich is the actual mastermind behind the case or not, he had to be aware of the investor's $5 million fraud suit in advance, and his employment agreement with 2nd Chance gave him the right to quit at any time and for any reason (*supra*, pg. 13 at ¶ 4). Therefore, Goodrich should have been on high alert against the Fosters using him to assist in the commission of any further crimes, and should have then exercised his right to quit at the first hint of the Fosters even *attempting* to do so.

Several of the homeowner victims were given no notice of the bankruptcy proceedings at all. Of the victims who were mailed notices, none were served with process, or otherwise treated like parties with an interest in the ownership of their homes. None of the victims could afford to hire a lawyer, and none had the knowledge of either the facts or law necessary to understand what the Fosters had actually done with their homes, or what was going on in the bankruptcy court, let alone appear in court on their own behalf. However, some victims gave Goodrich and the lawyers for 2nd Chance information that made it clear 2nd Chance did not legally own their homes. Yet instead of immediately ending their relationship with the Fosters, and withdrawing from the case, these learned officers of the Court choose to continue assisting the Fosters in knowingly selling stolen property.

No Chapter 11 Trustee has ever been appointed in the case, despite ample red-flag warnings and signs of egregious fraud warranting the appointment of a neutral Chapter 11 Trustee. Eight different Adversary Proceedings were filed[4] by creditors against the Fosters, their LLC's, and even one of the corrupt lawyers who aided them, all alleging essentially the same thing: fraud. In addition, representatives of Clotee Downing, an 83-year-old late stage Alzheimer's patient, filed a *pro se* Rule 59/60 motion to reverse the sale of her home. Poorly crafted and incomplete as it was, this motion was nonetheless sufficient to raise a red flag to the Court that Downing was mentally incompetent at the time of Ray's visit to her door, and told the basic and disturbing story of how the Fosters had stolen Downing's home. Judge Clarkson denied the motion on technical grounds. Judge Clarkson does not appear to have thereafter taken any action on his own initiative to ensure that there was no bankruptcy fraud or elder abuse going on in his courtroom (e.g. appoint a Chapter 11 Trustee, or direct either the U.S. Trustee or FBI to investigate).

## CURRENT VICTIM STORY SUMMARIES

The author of this summary has been able to locate and contact nine of the fourteen homeowner victims in the bankruptcy case. In every victim's case, there was a lack of intent to permanently convey title to the Fosters' LLC, so the grant deed is *void ab inito* because it were never delivered. Because most of the homes were purchased in foreclosure, and Ray promised the homeowner they could get their home back, those grant deeds were further void as a function of law under Cal. Civil Code § 1695.12.

Many of the victims have additional grounds why the deeds to their homes held by 2nd Chance were *void ab inito*, beyond the lack of delivery and/or Civ. Code § 1695.12.

Here are summaries of their stories.

---

[4] The titles, filing dates, and Bankr. C.D. Cal case numbers of these eight Adversary Proceedings are:
**(1)** *Official Committee of Unsecured Creditors v. Foster* (10/2/2023), 8-23-ap-01110
**(2)** *Official Committee Of Unsecured Creditors v. Gemma's Jewelers, Inc.* (10/2/2023), 8-23-ap-01111
**(3)** *Khzam v. 2nd Chance Investment Group, LLC* (10/13/2023), 8-23-ap-01028
**(4)** *Official Committee Of Unsecured Creditors v. American Express National Bank* (11/6/2023), 8-23-ap-01124
**(5)** *Official Committee Of Unsecured Creditors v. JPMorgan Chase Bank, N.A.* (11/6/2023), 8-23-ap-01125
**(6)** *Official Committee Of Unsecured Creditors v. Foster* (2/8/2024), 8-24-ap-01020
**(7)** *Official Committee of Unsecured Creditors v. Walker Law Group* (2/8/2024), 8-24-ap-01021
**(8)** *Official Committee Of Unsecured Creditors v. Foster* (2/8/2024), 8-24-ap-01022

**CLOTEE DOWNING**, [formerly] of **37472 Yorkshire Drive in Palmdale, CA 93550**, is an 83-year-old Stage 7 Alzheimer's patient, who was legally incompetent from Stage 6 Alzheimer's when Ray showed up uninvited at her door back on October 23, 2020. Back in 2016, Downing had been in Stage 4 Alzheimer's when she fell victim to a PACE / HERO home improvement contracting scam, and ended up with $160,000 in fraudulent property tax liens that made her mortgage unaffordable. As result of this elder financial abuse, Downing eventually ended up in foreclosure (LA County Doc # 20200354474).

During the twelve-month period just prior to Ray's October 2020 appearance, Downing's relatives arranged for her to have meetings with five different relators, and five different real estate attorneys, about options to avoid foreclosure and keep her home. Downing was so mentally incompetent during these meetings that she was unable to understand her situation, or even the most basic of real estate or financial concepts. Downing's relatives could not act for her because Downing had no Power of Attorney or conservatorship.

Ray then showed up uninvited at Downing's door **when she was home alone**, and gave her a simplistic pitch she *could* understand: he would save her house, and she could keep it. She just needed to pay him $1,000 a month for five years, after which he would simply *give* her house back to her. Ray had Downing sign a legally *void ab inito* grant deed, purporting to give her home to the Fosters' 2nd Chance LLC (Doc # 20201395931). Sonja then convinced Downing's mortgage provider to add her as a third party onto Downing's account. Sonja used this fraudulently-obtained access to take over Downing's mortgage account, by switching the mailing address, phone number and email address to addresses and numbers controlled by the Fosters.

Next, Sonja secretly tried but failed to get Downing's mortgage provider to approve a short sale, so 2nd Chance could profitably take out a hard money mortgage on Downing's home, while only using a small portion to pay off Downing's old mortgage. About a year later, the Fosters tried but failed to instead open a new mortgage *apparently in Downing's name* which would have financially benefited the Fosters. The Fosters nonetheless did succeed in draining Downing of over $32,000 in home equity and cash via her mentally competent relatives (who timely made all her monthly payments), until finally cutting off all communication and disappearing upon 2nd Chance's bankruptcy filing.

Downing's family members informed both Goodrich and 2nd Chance attorney Andy Warshaw that Downing was mentally incompetent from Alzheimer's, and that Ray had promised to give Downing her home back in five years. Warshaw instructed them to email proof to Goodrich, so the relatives then emailed Goodrich a copy of a home equity sales contract signed by Ray, which proved Ray had promised in writing to let Downing get her home back. Apparently understanding this written contract proved that 2nd Chance did not lawfully own Downing's home per Civ. Code § 1695.12, Warshaw then responded by emailing Downing's daughter a stipulation that he demanded she force mentally incompetent Downing sign, waiving Downing's rights under that contract. When the daughter [allegedly] refused, lawyers working for 2nd Chance then proceeded to both threaten and bribe the daughter into removing Downing from her home *against her will*, even though the daughter had no POA or conservatorship over Downing.

Downing's home was then sold by Judge Clarkson in a bankruptcy sale. Downing has been forced to shelter on a relative's living room couch ever since, where she cries in

confusion every single day about where she is, begs to be taken back home, and sometimes wanders off in an attempt to walk back to her stolen house. Downing desperately needs placement into an assisted living home, and physical therapy to delay the onset of loss of ambulation (and thus early death), but thanks to the theft of her home by the Fosters, neither she nor her family can afford this care. **Ray and Sonja Foster's criminal conduct is on track to be the proximate cause of Downing's early death**.

**JANICE ROBISON**, [still] of **3025 Glenview Ave in San Bernardino, CA 92407**, is a blind 67-year-old widow with early-stage Alzheimer's disease, who has lived in her home for 61 years, ever since she was a 6-year-old girl who still had some limited vision despite her glaucoma. Robison finally lost all her vision in 1967 at the age of 10, and her eyes were then surgically removed in 1976. Robison's familiarity with the physical location of everything in and around her lifelong home is the primary disability accommodation that has allowed her to continue to enjoy a life of freedom and independence as a blind senior citizen.

Robison's home was in foreclosure over a grand total of $20,180.95 in debt for which the mortgage holder had repeatedly refused to accept Robison's payments[5], when Ray came to her door uninvited in August of 2020. Ray immediately latched on to Robison's blindness as a vulnerability he could exploit, repeatedly telling Robison that he had helped many disabled people save their homes, while promising Robison that she could truly trust him. Ray promised Robison that she could stay in her home rent-free for five years, while his credit repair specialist helped her repair her credit. If after five years Robison couldn't pay Ray back in one lump sum, she could *still* keep her home, and just pay Ray $500 per month until his financial assistance had been repaid.

Robison never agreed to sell her home, nor signed any grant deed. Instead, Ray had Robison's niece Davedia Lamar direct blind Robison to sign a real estate POA, purporting to appoint Lamar as her Agent … only, multiple critical sections of this POA were left blank, and the two witnesses were Lamar (the Agent) and Lamar's daughter. Ray later attached a forged or falsified notary declaration in an apparent attempt to fix this witnessing defect, and then preserved this POA's remaining fatal *prima facie* defects by contemporaneously recording it as Doc # 2020-0304537. On the basis of this facially void POA, Ray then had Lamar sign a *void ab inito* grant deed as Robison's would-be attorney-in-fact, purporting to give Robison's home to 2nd Chance (San Bernardino Doc # 2020-0304539). Neither Robison nor Lamar knew that 2nd Chance then took out *two* mortgages on Robison's home, first with San-Diego-based Mark Lantzman's LMF 2, LP for $170,000 (Doc # 2020-0304540), and then with Loan Funder LLC for $182,000 (Doc # 2021-0242412).

---

[5] This debt and default wasn't due to any bad acts by Robison. In 1994, Robison's mother Lula Mae Lollis took out a $22,100 mortgage to help Robison's brother open a hair salon (San Bernardino Doc # 1994-365133). The brother defaulted on repayment, and a small portion of this debt was still outstanding in 2010, when Robison inherited her home by right of survivorship of her mother, pursuant to a 2008 grant deed (Doc # 2008-0020547). For years, Robison sent cashier's checks in <u>her</u> name to try to pay off this remaining mortgage debt, but the mortgage holder refused to accept her payments, because they weren't from "The Estate of Lula Mae Lollis." *Robison simply didn't know that she needed to file or record paperwork regarding her mother's death*. This eventually led to the recording of a Default on 2/26/20 (Doc # 2020-0067053).

Robison's home was eventually sold in a bankruptcy court sale, without Robison ever being served any notice about the bankruptcy case. The sale order stated that the Federal bankruptcy court retained subject matter jurisdiction over any UD issues, yet the buyer nonetheless filed a UD case *against Ray and 2nd Chance* in San Bernardino County Superior Court (LLTVA2400701). Robison was neither named nor served, and had no notice of this UD case until the Sheriff served her a notice to vacate. Robison was then not allowed to file any motions objecting to the lack of service or entry of default, or even have the disability accommodation of a *guardian ad litem* to assist her in presenting her case at a putative *Arrieta* hearing (which didn't even examine the merits of her *Arrieta* claim). Blind, early-stage Alzheimer's Robison is now due to be evicted from the only home she has ever known, as soon as Adult Protective Services can find a Medi-Cal nursing home to throw her into. This will not only rob Robison of her home, but permanently take away all of her substantive freedom and independence.

**SHAWN SOUTHERN**, [formerly] of **1611 151st Ave in San Leandro, CA 94578**, is a 74-year-old man who is very hard of hearing, and socially reclusive. Mr. Southern thought Ray was merely giving him a $63,000 loan to help pay off some non-mortgage bills, which Southern would then repay at a rate of $500 per month. Both Southern and a third party witness to his encounter with Ray say that Southern never agreed to sell his home, never signed any grant deed, never traveled to any notary, and never had any notary come to him. It would appear that the Fosters simply forged the grant deed which was recorded on 8/18/2022, giving Southern's home to the Fosters' Advance Real Estate & Construction Solutions LLC (Alameda Doc # 2022144698). Southern similarly had no idea the Fosters' LLC simultaneously took out a huge mortgage on his home with Mark Lantzman's Lantzman Investments Inc. (Doc # 2022144699).

Lantzman eventually bought Southern's home back in a trustee's sale on or about 6/4/24 (Doc # 2024068447). In late July of 2024, Lantzman – who admitted in front of witnesses that he knew the Fosters had stolen Southern's home and many others – sent an employee-agent to Southern's house, who illegally threatened 74-year-old Southern with both criminal arrest and eviction unless he left. Southern fled, but had had nowhere else to go, and Southern's tenant of 18 years, friend, and frequent personal assistant Jake Thompson has been unable to find him ever since. Southern is believed to now be homeless, and living in the streets of Alameda County.

**ROSENDO ESTORGA**, [still] of **1004 Peachwood Court in Los Banos, CA 93635**, thought Ray was refinancing his $760-per-month home mortgage payment down to just $400 per month. Estorga says he never agreed to sell his home, and says he ever signed any grant deed with Ray or his LLC, nor had contact with any notary. The Fosters apparently forged the grant deed that was recorded on 4/21/2022, giving Estorga's home to the Fosters' Advance Real Estate & Construction Solutions LLC (Merced Doc # 2022015963). Not only did Estorga not know about this grant deed, but he also didn't know about the huge mortgage the Fosters' LLC took out on his home with Mark Lantzman's LMF 2, LP, which was recorded on April 21, 2022 as Doc # 2022015964. Just like with Southern, Lantzman eventually bought Estorga's home back as part of a trustee's sale on or about 5/6/2024 (Doc # 2024010092). On 8/3/24, Mark Lantzman personally called Estorga, and threatened him in a manner similar to how Lantzman had also threatened Southern, falsely claiming that Estorga had to get out within 30 days, or

Lantzman would have him arrested by the Sheriff. Estorga rejected Lantzman's threats, and is currently awaiting Lantzman's next steps.

65-year-old **TAMMY PETERSON**, [formerly] of **43933 30th St East in Lancaster, CA 93535**, unexpectedly lost her Vietnam-veteran husband in early 2022 to complications of Agent Orange exposure. Suddenly left to deal with finances and real estate matters on her own for the first time, she had fallen into foreclosure only about a month before Ray appeared uninvited at her door in August of 2022 (LA County Doc # 20220728648). Ray expressed care and concern for Peterson's then-ailing live-in mother (who has since passed), and picking up on Peterson's religious convictions, prayed with Peterson, all as an apparent means of gaining her confidence.

Peterson told Ray she needed to lower her monthly mortgage bill, but was mortgage, real estate and computer "illiterate." Ray repeatedly told Peterson he was going to "save" her home, and offered to refinance her mortgage to lower her monthly payment, *plus* give her a small cash loan to perform some repairs around the house. Surprised, Peterson asked if she could have $5,000 for repairs. Ray offered $3,000, and wrote Peterson a check.

Peterson never agreed to sell her home, and did not understand that one of the documents Ray told her to sign on 8/29/2022 (the grant deed) actually gave ownership of her home to the Fosters' Advance Real Estate & Construction Solutions LLC (Doc # 20220855697). Real estate illiterate Peterson instead naively thought that all the documents Ray told her to sign were part of a normal mortgage refinancing process. Peterson also didn't know the Fosters' LLC immediately took out a $283,000 mortgage on her home with Mark Lantzman's LMF 2, LP (Doc # 20220855698). When the bankruptcy court eventually released the automatic stay on Peterson's home, Lantzman had it sold in a trustee's sale (Doc # 20230902686). Peterson now finds herself destitute in a rented room, while the relatives and grandchildren who lived with her have been uprooted from their lives and K-12 academic careers, and scattered across the country.

**TERESA MILLER** had also recently lost her Korea and Vietnam veteran husband, and her home at **827 N Meridian Ave. in San Bernardino, CA 92410** had fallen into foreclosure over just $6,193.33 (San Bernardino Doc # 2022-0167752), when Ray first appeared uninvited at her door in June of 2022. Upon finally being invited inside after his *second* unannounced appearance, Ray volunteered a false claim that he had served in the Army (a check of DOD records indicates Ray never served in the Army). In retrospect, Miller believes Ray likely saw one of her family's military plaques hanging on a wall, and then decided to impersonate a military veteran as a means of gaining her confidence.

Ray told Miller that he would save her home from foreclosure, and all she had to do was pay him back $750 per month for five years, after which she would get her house back. Miller never agreed or intended to permanently give ownership of her home to Ray or his LLC. She signed all the documents Ray demanded of her as a condition of his financial assistance (including a security collateral grant deed, Doc # 2022-0218660), but had no idea that the Fosters' LLC then took out a $305,000 mortgage on her home with Mark Lantzman's Lantzman Investments Inc. (Doc # 2022-0218661). Miller made her monthly payments to Ray as instructed, until she was unable to do so because the Fosters had disconnected all their phones, emails and websites around the time of the 2nd Chance bankruptcy filing.

During the bankruptcy proceeding, Lantzman personally called Miller, and arrogantly advised her that he knew Ray had stolen her home, but she had to deal with him now. A confused Miller couldn't understand who Lantzman was, or what possible interest he had in her home. Once the automatic stay was released, Lantzman had Miller's home sold in a trustee's sale (Doc # 2023-0252493). Miller and her son now find themselves renting a small room in the San Bernardino area.

**GREGORY CEKALOVICH** couldn't move out of his home at **37915 Marsala Drive in Palmdale, CA 93552** because his wife was terminally ill on home hospice care, and would have died from a move. Cekalovich contacted Ray as a result of a flyer the Fosters mailed to him, after the stress of his wife's illness led to a default over a mere $7,012.34 (LA County Doc # 20220368550). Cekalovich turned down offers of help from other legitimate real estate professionals, because Ray not only promised Cekalovich that he and his ailing wife could stay in their home for five years at just $750 per month, but also promised that he could then buy his home back for the cost of Ray's expenses plus five percent. Cekalovich didn't know that the day after he signed the grant deed on 6/5/2022 (Doc # 20220641677), the Fosters' Advance Real Estate & Construction Solutions LLC took out a $310,000 mortgage with Mark Lantzman's LMF 2, LP (Doc # 20220641678).

Cekalovich made every monthly payment to Ray - even after his beloved wife passed away in early 2023 - **and kept meticulous records and receipts**. Cekalovich kept sending cashier's checks by certified mail even *after* the bankruptcy filing, insisting that 2nd Chance's "Chief Restructuring Officer" David M. Goodrich accept his checks well into the bankruptcy case. Cekalovich also told Goodrich and lawyers for 2nd Chance about Ray's promises that he could stay in his home for five years, then buy his home back … information that would have alerted Goodrich and these lawyers that 2nd Chance was not the lawful owner of Cekalovich's house. But none of Cekalovich's payments or communications mattered. 2nd Chance's bankruptcy court filings *still* falsely claimed both that 2nd Chance owned Cekalovich's home, and that Cekalovich had breached his lease for non-payment of rent. When the automatic stay was released, Lantzman bought Cekalovich's home back in a trustee's sale (Doc # 20230902686), before then reselling it to a third party. Cekalovich and his daughter were forced to move out of California.

**KEISHA TERRELL** and her older sister **ALICIA TERRELL** owned a third-generation family home at **730 & 732 East 78th St. in Los Angeles, CA 90001** which their mother had left to them jointly. They owned the home free and clear, but Keisha wanted to turn the house into a revenue-generating rental property. In July of 2022, Keisha saw a TV ad for 2nd Chance, and called the number. In later speaking with Ray, she learned that she and Ray had gone to McKinley Elementary School together as children.

Keisha never agreed to sell the family home that she and Alicia had inherited. Keisha only agreed to let Ray finance a refurbishment to turn the home into a rental property; Ray would then be repaid out of the rental income (the specific amount of repayment per month was never specified). Keisha did not understand the legal significance of the grant deed that Ray had Keisha alone sign on 7/10/22, giving the home to the Fosters' Advance Real Estate & Construction Solutions LLC (LA County Doc # 20220723888). Keisha also didn't know that on 7/8/2022 - two days prior to her signing that grant deed - the Fosters had already negotiated a $510,000 mortgage with Mark Lantzman's LMF 2, LP

(Doc # 20220723889). In an act unprecedented with any other victim, Ray then wired $200,000 into Keisha's account, as an "investment loan" to pay for the cost of the refurbishment they had agreed to. A portion of this loan was to be given to Alicia to temporarily move out during construction. Ray told Keisha to call him in October of 2022 to get the repairs started, but when Keisha then called as instructed, Ray's phone was disconnected.

The bankruptcy court eventually released the automatic stay, and the third-generation family home Keisha and Alicia's mother jointly left to them was sold in a trustee's sale (Doc # 20240038513). The buyer was Lantzman, who was advised the home had been stolen, yet knowingly resold this stolen property anyway (Doc # 20240038513), while issuing a mortgage to his buyer (Doc # 20240038513). Keisha was able to shelter with a friend in Southern California. Alicia was forced to move out of state.

**KATHY and FABIAN MARTINEZ** [still] of **13352 Marty Lane in Garden Grove, CA 92843**, had two mortgages on their home, the first recorded back on 10/13/2005 for $471,750 (Orange County Doc # 2005000821924), and a second recorded on 5/26/2006 for $75,000 (Doc # 2006000355493). When COVID hit in 2020, the Martinezes didn't timely get their unemployment benefits, contributing to a Default on their second $75,000 mortgage being recorded on 11/3/2020 (Doc# 2020000630095). A Trustee's Sale Notice followed thereafter on 3/11/2021 (Doc # 2021000171261).

Like Cekalovich, Fabian also contacted Ray as a result of a flyer the Fosters mailed to the house. Ray then came to the Martinezes' home in late March of 2021. "No problem, I can help," Ray assured them. Ray offered to pay off their second $75,000 mortgage that was in foreclosure, and 2nd Chance LLC would then be listed as the new second lien holder on the title. Kathy and Fabian would remain on title as the owners of record, and would pay Ray $2,500 a month for five years. Ray (or 2nd Chance) would take over sending in the payments on the first mortgage, using a portion of the Martinezes' monthly $2,500 payment as the source of funds (Ray was not going to pay off this first mortgage). At the end of the five year period, the Martinezes would be able to get full possession of their home back by paying off any remaining balance on Ray's $75,000 bailout loan.

On 4/3/2021, the Martinezes drove to 2nd Chance's office to sign documents. They had never agreed to sell their home to Ray or 2nd Chance, and questioned Ray about what the purpose of the grant deed was. Ray told them the grant deed was just to add him (or rather, 2nd Chance) as the new second lien holder on the title, as they had agreed to. Ray assured the Martinezes they would not be coming off the title as the home's owners, the grant deed was only for security collateral because he had "to protect my money," and at the end of the five year period, the Martinezes would be able to get their home back as promised. The grant deed was then recorded on 4/6/2021 (Doc # 2021000234642).

Ray told the Martinezes he needed access to their online account with their first mortgage provider, and asked them to give their login information to Sonja. Once Kathy texted Sonja her username and password, Sonja took over the account the same way she had taken over Downing's: by immediately changing all the contact information. Sonja then changed the username and password, so the Martinezes couldn't get back into their own account. The Martinezes do not yet know what the Fosters did on their account between May of 2021 and December of 2022, as they have not yet obtained copies of all

communications on their account during that period. However, the author suspects they will discover a failed short sale attempt, just like Sonja tried to do with Downing's house.

The Martinezes timely made all their $2,500 monthly payments via cashier's checks made out to Rayshon Foster, paying Ray a total of $50,000 between May 1, 2021 and December of 2022. Then, in mid December of 2022, the Martinezes found a notice on their door from their first mortgage provider, warning them that their first mortgage was about to go into foreclosure. Only then did the Martinezes discover that while Ray had continued cashing their $2,500 checks, he had stopped sending in payment on their first mortgage in or around August of 2022. This was also the first moment when they learned that 2nd Chance was now listed on title as the owner of their home, and their previously-grandfathered-in low property taxes had skyrocketed as a result of the alleged sale.

After explaining the situation to their mortgage provider, and having Sonja's takeover of their account undone, the Martinezes resumed making direct payments on their first mortgage. However, they have been struggling with the back due payments and increased taxes they now owe, and their credit has been harmed by the Fosters' fraud schemes.

In 2nd Chance's bankruptcy case, Ray falsely claimed that 2nd Chance owned the Martinezes' home. In February of 2023, the Martinezes then got an emailed letter from Warshaw, claiming they had breached their lease for non-payment of rent … an outrageous charge, given that the only party who hadn't make the payments they agreed to had been 2nd Chance and Ray. The Martinezes responded, and informed Warshaw of the true facts. They were surprised when a "For Sale" sign from Coldwell Banker later appeared on their front lawn. The Martinezes called the listing agent, and also had a friend who worked for Coldwell Banker contact the agent. The listing was pulled down. It is unclear what the current status of the Martinezes' situation is in the bankruptcy case, but the title to their home is still clouded by the fraudulent grant deed Ray recorded.